**In re Jerome SAYLER, Margaret Elaine Sayler, Debtors.**

**The PEOPLES STATE BANK AND TRUST COMPANY, Plaintiff,**

v.

**Jerome SAYLER, Margaret Elaine Sayler and Lynn D. Allison, Trustee, Defendants.**

**Bankruptcy No. 85–11742.
Adv. No. 86–0024.**

United States Bankruptcy Court, D. Kansas.

Oct. 10, 1986.

Ernest McRae, McRae & Early, Wichita, Kan., for debtor.

Lynn D. Allison, Wichita, Kan., Trustee.

Greg L. Bauer, McPherson, Bauer, Pike & Pike, Chartered, Great Bend, Kan., for Peoples State Bank and Trust Company of Ellinwood, Kansas.

Mark D. Calcara, Watkins, Calcara & Rondeau, Great Bend, Kan., for American State Bank and Trust Company of Great Bend, Kansas.

## MEMORANDUM OF DECISION

JOHN K. PEARSON, Bankruptcy Judge.

This matter is before the Court for hearing on the objection to the debtors' exemption of certain life insurance policies by the American State Bank and Trust Company of Great Bend, Kansas (hereinafter "American State" or "ASB") and the trustee, Lynn Allison (hereinafter "the trustee") and the above captioned complaint to determine the dischargeability of debt filed by the Peoples State Bank and Trust Company of Ellinwood, Kansas (hereinafter "Peoples" or "PSB"). Margaret Elaine Sayler, the codebtor in the above captioned case, was previously dismissed. Jerome Sayler (hereinafter "Sayler" or "the debtor") appears by Ernest McRae of McRae & Early, Wichita, Kansas; American State appears by Mark D. Calcara of Watkins, Calcara & Rondeau, P.A., Great Bend, Kansas. Peoples State Bank appears by Greg L. Bauer of McPherson, Bauer, Pike & Pike, Chartered, Great Bend, Kansas.

## FACTS

1. The debtor is a medical doctor and has practiced in Great Bend and Illinois, Kansas for many years.

2. He filed his petition for relief under Chapter 7 of the United States Bankruptcy Code on September 18, 1985.

3. The debtor became 65 years of age on July 25, 1985.

4. At all times material hereto, the debtor was a principal and stockholder in Central Kansas Pathological Associates, Chartered. He was also a beneficiary of two ERISA qualified plans known as the Central Kansas Pathological Associates, Chartered Employees Profit Sharing Plan and Trust and the Central Kansas Pathological Associates, Chartered Employees Pension Plan and Trust. Hereafter both will be referred to jointly as "the Plans". At all times relevant, the debtor and Dr. Edward L. Jones were the designated trustees of the two ERISA plans.

5. The debtor and Margaret Elaine Sayler were married in 1979.

6. In early 1982, the debtor was indebted to the Plans in the approximate amount of $258,000.00. He was informed by the Plans' accountants and advisors that he must repay the loans prior to June 1, 1982 or run the risk of incurring a substantial tax liability under then recent changes in the ERISA law.

7. At the relevant point in 1982, the debtor's vested interest in the Plans totaled $355,285.65. (P.S.B. Exhibit 3).

8. On May 28, 1982, the debtor called Alan Isern, president of PSB, and set up a meeting for later that morning.

9. At that time the debtor had had a business relationship with PSB for several years, including substantial farm borrowings for a farm corporation he owned by the name of "Jerel, Inc." [1]

10. On the morning of May 28, 1982, the debtor indicated to Isern that he wished to borrow $300,000.00.

11. Mr. Isern had other obligations that morning and contacted Evelyn Miller of the bank staff to prepare the loan papers and told her that the loan was approved if the debtor could pledge collateral.

12. Mrs. Miller was a senior vice president of PSB and has worked in the bank for several years. Mrs. Miller originally drafted two promissory notes dated May 18, 1982 for the debtor to execute, one in the amount of $200,000.00 and another in the amount of $100,000.00. (Debtor's Exhibit "K"). She contacted Ray Cheely, the CPA and financial advisor to the Plans and determined that the debtor was unable to pledge his interest in the Plans as collateral for the notes.

13. The two May 28 notes were later replaced by two other notes for the same amounts, but which were signed by debtor and his wife, and which were for a shorter period of time. (Debtor's Exhibit "L").

14. The debtor promised to do whatever was necessary to secure the borrowing. The debtor did not represent that the money was to be used to fund the Plans, but stated that he was going to put the money into the Plans. The debtor did not state that he was indebted to the Plans for prior borrowing.

15. Both the debtor and the officers of PSB subsequently determined that the debtor could neither pledge his interest in the plan nor, as trustee, pledge any of the assets of the plan to secure the borrowing. This came about when PSB attempted to have the note redrawn to show the promissor as the Plan trustees. *See* Debtor's Exhibit "C". In any event, the debtor, on May 28, 1982, left PSB with certificates of deposit in the total amount of $300,000.00 in the name of the two Plans.

16. The C.D.s were delivered to the CPA, Ray Cheely, in his capacity as financial advisor to the Plans, who applied them on the debtor's indebtedness. The debtor's total indebtedness to the Plans was approximately $258,000.00. The excess was repaid to debtor by two checks from the Plans; one in the amount of $15,885.95 and the other in the amount of $26,104.40. *See* Peoples State Bank Exhibit 10.

17. Over the course of the next several months, the PSB and the debtor repeatedly corresponded concerning his obligation on

---

1. Although not relevant to the instant proceedings, Jerel, Inc. underwent Chapter 11 proceedings and subsequently was liquidated in a Chapter 7 bankruptcy pending before this Court. The debtor had guaranteed those borrowings individually.

the loan and the pledge of the certificates of deposit to secure the loan. The certificates of deposit were physically returned to PSB for safekeeping and a safekeeping receipt was issued. The certificates of deposit, however, remained in the name of the Plans.

18. PSB ultimately sued the debtor and his wife in Barton County, Kansas District Court on November 29, 1983 over their liability on the notes giving rise to the certificates of deposit in the name of the Plans. Although the Plans have been granted summary judgment, that action is still pending against the debtors, but stayed by these bankruptcy proceedings.

19. In 1983, Jerel, Inc., the farming venture owned by the debtor, filed a Chapter 11 proceeding before this Court. *See* Case No. 83–11593. The debtor had personally guaranteed the various indebtedness of Jerel, Inc.

20. Sometime in 1985, the District Court of Barton County, Kansas, allowed the Plans' trustees to withdraw the funds represented by the certificates of deposit originally issued by PSB. The exact date is not before the Court.

21. On June 1, 1985, pursuant to the terms of the Plans, the debtor withdrew all of his vested benefits in the Plans totaling $585,000.00.

22. As of June 1, 1985, the debtor was party to the following lawsuits:

| Plaintiff | County Pending | Date Filed | Amount Sought |
|---|---|---|---|
| American St. Bk. | Barton Cty.D.C. | 04/12/85 | $405,018.31 |
| Security St. Bk. | Barton Cty.D.C. | 02/11/85 | $142,856.58 |
| Peoples St. Bk. | Barton Cty.D.C. | 11/29/83 | $300,000.00 |

23. As of June 1, 1985 the debtor was hopelessly insolvent in that his liabilities substantially exceeded his assets and he was generally not paying his obligations as they came due.

24. As of June 1, 1985, when the debtor began withdrawing his vested plan benefits, he was the owner and insured under the following listed insurance policies as reflected in the debtor's B–2 schedules:

| Name | Policy No. | Date of Issue | Amt. of Ins. | Cash Value |
|---|---|---|---|---|
| U.S.A. National Life Ins. | V–803–84–87 | 01/01/47 | $8,500.00 | $4,640.00 |
| U.S.A. Government Life | R1–143–136 | 06/01/40 | $1,500.00 | $850.00 |
| Alliance Life Ins. Co. | 54196 | orig. 1978 converted 08/07/83 | $183,000.00 | none |
| Valley Forge Life Ins. CNA Ins. Co. | 77006005 | orig. 1972 reissue 08/07/83 | $60,000.00 | $22,193.63 |
| Travelers Life Ins. Co. | 3736719 | 12/22/71 | $100,000.00 | $22,817.00 |
| Professional Life Casualty | PL7000 | 07/01/79 | $30,000.00 | $4,923.90 |
| Professional Life Casualty | PL6123 | 10/05/77 | $10,000.00 | $2,177.30 |
| Southwestern Life Ins. Co. | 900–061996 | 04/10/85 | $350,000.00 | $166,995.00 |
| U.S. Fidelity Guarantee | U 700 692 | 03/03/84 | $250,000.00 | $40,851.88 |

| Name | Policy No. | Date of Issue | Amt. of Ins. | Cash Value |
|---|---|---|---|---|
| U.S.F. & G.[2] | U 709409 | 05/20/85 | $100,000.00 | $12,245.76 |
| U.S.F. & G.[2] | U 709716 | 05/20/85 | $100,000.00 | $13,955.06 |
| TOTAL FACE VALUE | | | $1,190,300.00 | |
| TOTAL CASH VALUE | | | | $291,649.53 |

25. Although it appears that the debtor began consulting Rob Laing, an agent for Southwestern Life Insurance Company, sometime prior to April 20, 1985, on that date he completed an application for insurance with Southwestern Life Insurance Company. In electing to make the application, the debtor discussed at length with his counsel and Mr. Laing the possible legal consequences of the policy. The debtor was advised of the *In re Threewitt*, 24 B.R. 927 (D.C.Kan.1982) decision, and discussed it with Mr. Laing and with Mr. McRae.

26. Southwestern Life Insurance Company offered to the debtor what is known as a universal life insurance policy which permits the payment of a substantial single premium which is then invested by the insurance company and the income used to pay future premiums. Debtor discussed the alternatives of a policy with a smaller face value which would have been paid in full. The debtor also discussed the investment opportunities represented by the insurance policy and understood fully that any investment income was sheltered by the life insurance tax rules. The debtor's testimony indicated that the debtor considered the investment return on the cash value of the policy a substantial factor in his selection thereof. As of the date of filing bankruptcy, the insurance policy had a face amount of $350,000.00 and a cash value of approximately $166,000.00 and would have returned the cash value to the beneficiary, the debtor's wife and co-debtor, upon his death in addition to the face amount of the policy.

**2.** These policies were taken out in 1978. It was required that they be converted at age 65, thus the issue date of "5-20-85".

**3.** The debtor testified that the tax consequences of a lump sum distribution to him was one of

27. As indicated above, the debtor, on June 1, elected to withdraw the proceeds from his pension plans and used the $585,000.00 proceeds as follows:

| | | |
|---|---|---|
| a. | Pay off mortgage and remodel his homestead: | $ 8,500.00; |
| b. | Purchase of two new vehicles: | $ 30,000.00; |
| c. | Miscellaneous household goods: | $ 3,000.00; |
| d. | U.S.A. National Life Insurance, repay loan: | $ 600.00; |
| e. | Professional Life Casualty, repay loan: | $ 3,400.00; |
| f. | Professional Life Casualty, repay loan: | $ 1,600.00; |
| g. | Travelers Life Insurance, repay loan: | $ 7,000.00; |
| h. | U.S.F. & G., convert term policy: | $ 13,297.00; |
| i. | U.S.F. & G., convert term policy: | $ 13,297.00; |
| j. | Alliance Life Insurance, one year's premium: | $ 19,000.00; |
| k. | U.S.F. & G., repay loan: | $ 20,000.00; |
| l. | Valley Forge Life Insurance, repay loan: | $ 6,000.00; |
| m. | Prepayment of taxes upon lump sum distribution: | $212,000.00; [3] |
| n. | Pay professional fees to CPA and counsel: | $ 19,000.00 |

With the balance of the proceeds from the withdrawal of the plan funds, the debtor made payments to Southwestern Life Insurance Company as follows:

| July 12, 1985 | $10,000.00; |
|---|---|
| July 29, 1985 | $165,000.00. |

The life insurance policy was prepared and delivered to the debtor upon receipt of the second premium payment. The above figures total $531,694.00, and are, in part, based on debtor's estimations given at trial.

28. The part of the proceeds paid to U.S.F. & G. were for the conversion of existing life insurance policies to two new policies of the universal life variety. The previous policies were term life insurance policies which had to be replaced or they expired upon the debtor reaching age 65. Although there has been considerable discussion in the pleadings, of the debtor's

the major factors in withdrawing his funds from the Plans. The withdrawal resulted in a calculated tax payment in 1985 of $212,000.00. Apparently that was overpaid and the trustee has recovered approximately $50,000.00 for the estate.

poor health, there was no evidence presented in court as to the debtor's health, poor or otherwise. The insurance companies appear to have been quite willing to insure the debtor, either on a new or on a conversion basis.

29. The debtor intended to place the funds withdrawn from his Plans beyond the reach of creditors.

## CONCLUSIONS OF LAW

1. The two U.S.F. & G. policies issued upon the conversion of the term life insurance to the universal life were "issued" within one year of the filing of the debtor's bankruptcy.

2. The debtor did not make the necessary misrepresentations to support an objection to dischargeability pursuant to 11 U.S.C. § 523(a)(2).

## DISCUSSION

There are two issues presently pending before the Court for decision. Both involve what are essentially questions of fact, whether the debtor made certain decisions or representations with the necessary intent. For the reasons outlined below, the Court concludes that the debtor did not make a false representation upon which PSB relied to its loss and that he purchased a life insurance policy with intent to defraud and therefore should be denied the exemption.

## SECTION 523(a)(2)(A)

■ PSB asserts the debtor's obligation to it should be excepted from the discharge pursuant to § 523(a)(2)(A) of the Bankruptcy Code. That section excepts from the debtor's discharge a claim for money which debtor obtained by false pretenses, a false representation or actual fraud other than that involved in a false financial statement. Exceptions to discharge are construed narrowly and the burden of proving that a debt falls within the statutory exception is on the party opposing discharge. *In re Black*, 787 F.2d 503 (10th Cir.1986). The creditor must prove

that the debtor's action come within the statutory exception by clear and convincing evidence. *In re Black, supra.* Section 523(a)(2)(A) includes only those frauds involving moral turpitude or intentional wrong and does not extend to fraud implied at law. *In re Black, supra.* Intent is a question of fact to be determined from the totality of the circumstances.

There are five elements which a creditor must prove to have a debt determined to be nondischargeable under § 523(a)(2)(A):

1. The debtor must have made a false representation;

2. The debtor must have known at the time the representation was made that it was false;

3. The debtor must have made the false representation with the intention and purpose of deceiving the creditor;

4. The creditor must have relied upon the misrepresentation; and

5. The creditor must have sustained damage as a result of the misrepresentation. *See In re Ridgway*, 24 B.R. 780 (Bankr.D.Kan.1982).

■ Even viewing the evidence in the light most favorable to the PSB, the Court cannot conclude as a matter of fact that the debtor made a false representation or that the PSB relied on the representation. The Court thus concludes that the PSB has failed to bear its burden of proof. The debtor waited until literally the last possible business day before he had to make the payments to the Plans or face serious tax consequences. He then contacted PSB and spoke to Mr. Isern who was busy and turned the loan over to another bank officer with instructions to make the loan if the debtor could pledge collateral. PSB had had a long series of dealings with the debtor and had found him to be trustworthy in the past. The debtor testified emphatically that he made no statements as to the purpose of the proposed loan.[4] Faced with substantial potential tax consequences, the debtor was quite willing to promise to secure the loan in any fashion

4. The debtor's statements to the effect that he thought he was getting an unsecured signature loan in the amount of $300,000.00 are not credible.

acceptable to PSB. The fact that Ms. Miller doubted that the debtor had the ability to make the pledges and investigated by calling debtor's CPA suggests that both were at least ignorant of the legal niceties involving the Plans.

In any event, there is substantial testimony to support the statement that the debtor promised to do literally anything within his power to secure the loan. The Court cannot find that he either misrepresented the purpose of the loan or that he misrepresented his ability to secure the loan. No other representations were involved in obtaining the loan.

Even were the Court to conclude that one of the statements by the debtor was in fact the necessary false representation, it clearly appears that PSB relied more upon what it thought was its ability to setoff or cancel the certificates of deposit than upon any misrepresentation by the debtor. Thus, the Court concludes that there was no misrepresentation and if there were PSB did not rely thereon and therefore PSB's complaint under § 523(a)(2)(A) fails.

### THE INSURANCE POLICIES

The issues before the Court with respect to the various insurance policies are complicated and relate directly to the limits upon an individual debtor's efforts to place assets beyond the reach of creditors. Kansas residents have available some of the broadest exemptions in the United States. That liberal grant of exemption dates back to the post-Civil War period when Kansas offered the broad exemptions to encourage immigration.

The central facts are not in dispute. The debtor, while insolvent in June of 1985, withdrew $585,000.00 from the Plans, and obviously with bankruptcy estate planning advice, used the proceeds to pay off the mortgage on his homestead, purchase two exempt vehicles, and buy some additional household goods. The balance of the money was placed in various life insurance policies.[5] The ultimate issue to be resolved by the Court is whether some of those

policies were obtained by the debtor for the purpose of defrauding one or more of his creditors.

 There are, however, two questions that must be dealt with first. Although the creditors and the trustee have waived the objection to certain of the debtor's older policies, the trustee and the creditors challenge two U.S.F. & G. policies which were reissued upon conversion of term policies on May 20, 1985. The initial question is whether these policies were "issued" within one year of the filing of the bankruptcy as that term is used in K.S.A. 40–414. *See infra* fn. 7. Subsection (b)(1) of that statute excepts from the general exemption rule a policy issued on or within one year of the filing of bankruptcy. The key phrase is "issued".

The debtor had existing term policies with U.S.F. & G. which, upon the payment of $13,297.00 each were converted to universal life policies having face amounts of $100,000.00. Had the policies not been converted, they would have lapsed on the debtor's 65th birthday. The question is whether the policies were "issued" within the meaning of the statute or whether they somehow relate back to the original issuance of the term policies. The sole Kansas case which appears to have construed the definition of issue is *Fisher v. Central Surety Insurance Corp.*, 149 Kan. 38, 86 P.2d 583 (1939). There the court stated:

> Ordinarily by "issue" of an insurance policy is meant its delivery and acceptance whereby it comes into full force and effect as a binding obligation. (Citations omitted.)

149 Kan. at 46, 86 P.2d 583.

In this case the policies (Exhibits Y and Z) bear issue dates of May 20 and May 3, 1985 respectively. Under general provisions on page 9, each policy provides that the effective date for coverage is the "policy date". The policy date is the same as the date of issue. The Court therefore concludes that the date of issue and the policy date are the same and under the *Fisher* case, *supra*, both policies were is-

---

**5.** Substantial taxes were also paid. *See* fn. 3 above.

sued within one year of the filing of the bankruptcy. Since a new policy was issued, conversion in this case does not relate back to the original issuance of the term policy converted.

A second threshold issue is raised by the debtor. As indicated the debtor converted the pension plans, which were under the law of this jurisdiction exempt property,[6] into the life insurance policies. The debtor argues, in effect, that by converting the Plans to the policies he never subjected these funds to the claims of creditors. Had he converted the policies to other types of exempt assets within the general rule on exempt property in Kansas, the debtor would probably be right. However, the insurance policies to which he converted the proceeds fall within a different rule and therefore his argument must fail. As discussed below, the rules on fraudulent conveyances apply to insurance policy cash values. Had he used the funds withdrawn

from the pensions to pay existing obligations to unsecured creditors there would be no argument but that a § 547 preference was involved. Likewise had he withdrawn the funds and given them without consideration to one of his children, a § 548 fraudulent transfer action would be viable. Those funds that he placed in incontestably exempt assets, the payments on his homestead and the purchase of the cars, are clearly beyond the trustee's reach. However, because of the peculiar language of the insurance exemption statute, and the mere fact that he took what were probably exempt assets and converted part of them into life insurance brings those assets within the provisions of K.S.A. 40–414, including the limitations, and therefore the argument that they were from an exempt source must fail.

The applicable statute is Kansas Statutes Annotated 40–414.[7] Prior to the amend-

6. *See In re Threewitt,* 24 B.R. 927 (D.C.Kan. 1982) (J. Kelly.)

7. Prior to 1984, K.S.A. 40–414 read as follows: In case any life insurance company or fraternal benefit society shall have issued or shall hereafter issue any policy or policies of insurance or beneficiary certificates upon the life of an individual and payable at the death of the assured, or in any given number of years, to any person or persons having an insurable interest in the life of the assured, all such policies and their reserves, or the present value thereof, shall inure to the sole and separate use and benefit of the beneficiaries named therein, and shall be free from: The claims of the assured, and shall also be free from the claims of the person or persons effecting such insurance, their creditors and representatives, and shall be free from all taxes, and the claims and judgments of the creditors and representatives of the person or persons named as beneficiaries in said policy or policies of insurance: That nothing herein shall be construed as restricting the right of the assured to change the beneficiary where the policy reserves such a right to the assured: That nothing herein shall be construed as exempting from taxation, any real estate which may at any time be carried by any life insurance company as a part of its legal reserve.
In 1984 it was amended to read as follows:
(a) If a life insurance company or fraternal benefit society issues any policy of insurance or beneficiary certificates upon the life of an

individual and payable at the death of the insured, or in any given number of years, to any person or persons having an insurable interest in the life of the insured, the policy and its reserves, or their present value shall inure to the sole and separate use and benefit of the beneficiaries named in the policy and shall be free from:
(1) The claims of the insured or the insured's creditors and representatives;
(2) the claims of any policyholder or the policyholder's creditors and representatives, subject to the provisions of subsection (b);
(3) all taxes, subject to the provisions of subsection (d); and
(4) the claims and judgments of the creditors and representatives of any person named as beneficiary in the policy of insurance.
(b) The nonforfeiture value of a life insurance policy shall not be exempt from:
(1) Claims of the creditors of a policyholder who files a bankruptcy petition under 11 U.S.C. § 101 et seq. on or within one year after the date the policy is issued if the policy was obtained by the debtor for the purpose of defrauding one or more of the debtor's creditors; or
(2) the claim of any creditor of a policyholder if execution on judgment for the claim is issued on or within one year after the date that the policy is issued if the policy was obtained by the debtor for the purpose of defrauding one or more of the debtor's creditors.
(c) Nothing in this section shall be construed as restricting the right of the insured to

ments enacted in 1984, K.S.A. 40–414 permitted virtually unlimited funds to be sheltered from the claims of creditors. Kansas law has long been to the effect that a debtor is entitled to convert nonexempt assets into exempt assets. *McConnell v. Wolcott,* 70 Kan. 375, 78 P. 848 (1904). The sole recognized exception to the general rule is that the debtor cannot so place assets out of the reach of a creditor who has a "peculiar equity" in those assets. A creditor was held to have a peculiar equity in funds used by a debtor to acquire exempt property where the funds were either fraudulently procured from the creditor or where the creditor had a lien on the assets or property converted to procure the exempt cash. *Long v. Murphy,* 27 Kan. 375 (1882); *Tootle, Hanna & Co. v. Stine,* 31 Kan. 66, 1 P. 279 (1883); *McConnell v. Wolcott,* 70 Kan. 375, 78 P. 848 (1904); *Exchange State Bank v. Poindexter,* 137 Kan. 101, 19 P.2d 705 (1933); *Metz v. Williams,* 149 Kan. 647, 88 P.2d 1093 (1939).

In 1984, apparently to correct a perceived abuse, the Legislature amended K.S.A. 40–414.[8] The first case to reach the court on the insurance exemption before the 1984 amendments, was heard by the Honorable James A. Pusateri. *See In re Barash,* 69 B.R. 231 (Bankr.D.Kan.1984). The court stated that the burden of proof is on the party objecting to the exemption to show that debtor is not entitled to claim the exemption. The court then concluded that the trustee and the objecting creditor had not met their burden of proof. There the creditors relied simply on the conversion of nonexempt assets into exempt assets. The court held that because the case arose under K.S.A. 40–414 before the 1984 amendments the general rule that debtor could, with impunity, convert nonexempt assets into exempt assets, controlled, and thus the trustee's objections were unfounded.

The first case to reach the court after the 1984 statutory amendments, was *In re Washburn,* Case No. 85–10800 (Bankr.D. Kan. April 29, 1986). In that case the Honorable Robert B. Morton, after a careful and detailed dissection of not only Kansas exemption law in general, but K.S.A. 40–414, concluded that the objection to the exemption should be overruled. After carefully reviewing not only the statute and its limited legislative history, but the rules of construction for statutory enactments, the Court concluded by saying:

> The creditor must show that the policy was obtained "for the purposes of defrauding" the debtor's creditors. However, while both paragraphs (1) and (2) of subsection (b) are limited to one year from the issuance of the policy, the provisions are not limited to a certain type of creditor. In other words, any creditor, with or without a "peculiar equity," may attack the issuance of the policy if the creditor can show that it was obtained for the purpose of defrauding creditors. The amendment to Kan.Stat.Ann. § 40–414 appears to be designed to bring the insurance exemption provision more within the purview of the fraudulent conveyance law as it is applied when no exempt property is involved.

This Court accepts the reasoning of *Barash,* with reference to the burden of proof, and *Washburn* and concludes that a creditor must show that a policy was obtained for the purpose of defrauding creditors and that the court should look to the Kansas fraudulent conveyance law for assistance in ascertaining that intent.

Unfortunately the Kansas cases are not entirely consistent. There is a substantial body of authority to support the proposition that the mere transfer of property to a relative while insolvent is fraudulent as a matter of law. In one of the earliest cases, the *Lowell Woodward Hardware Compa-*

change the beneficiary if the policy reserves that right to the insured.

(d) Nothing in this section shall be construed as exempting from taxation any real estate which may at any time be carried by any life insurance company as a part of its legal reserve.

**8.** *See* fn. 7 above.

*ny v. Semke,* 105 Kan. 628, 185 P. 732 (1919), the Supreme Court had to deal with the transfer of property by debtor to his wife without consideration whereby he placed all of his property subject to being taken by creditors beyond their reach. There the Court noted that the wife had secured the transfer of the property to her because of the "poor financing" of her husband and, fearing that all property would be lost, she and he together concluded to place it beyond his control. The Court continued:

> This was the wife's acknowledged purpose. But, granting that there was no actual intent on her part to defraud his creditors, the placing of it beyond his control by a transfer which was without consideration, when there were creditors, amounted to fraud in law.

In *Farlin v. Sook,* 30 Kan. 401, 1 P. 123, it is said:

> "It is doubtless true that when the conveyance is entirely without consideration, or when such consideration is entirely some reservation or benefit to the grantor, or when the conveyance is upon some secret trust for the benefit of the grantor, or to one having no personal interest in the conveyance, such as a mere assignee, the knowledge and intent of the grantee are immaterial and the conveyance may be set aside at the instance of creditors." (p. 404.)

*Id.* at 630, 185 P. 732. In a later case the Supreme Court stated the rule as follows:

> Voluntary conveyances by mortgagors to their children of all nonexempt and unencumbered property, while in default on a real estate mortgage, and when there was no market value of the mortgaged property equal to the mortgage indebtedness, with the result that a deficiency judgment could not be satisfied, constituted fraud in law and the mortgagee was entitled to have a conveyance set aside and the property sold to pay the deficiency judgment.

*Security Benefit Association v. Swartz,* 146 Kan. 267, 70 P.2d 16 (1937), Syllabus 1.

Likewise in *Farmers State Bank v. Mitchell,* 143 Kan. 286, 55 P.2d 423 (1936), the court stated the rule:

> A voluntary conveyance can be sustained as against existing creditors, only when under all the circumstances of the case, the property retained by the grantor furnished reasonable and adequate provision for the discharge of his debts.

Syllabus 4.

No reported recent cases adhere to the fraud as a matter of law holdings of the *Hardware* and *Swartz* cases. In *Jayhawk Equipment Company v. Mentzer,* 193 Kan. 505, 394 P.2d 37 (1964), the court quoted from both *Swartz* and *Semke* and stated its continued adherence to those rules, but distinguished them and did not apply them in the facts of that particular case.

■ The Court declines to apply the "fraud as a matter of law" line of cases. To do so would render *any* purchase of life insurance a fraudulent conveyance as to creditors for at least one year irrespective of the debtor's other circumstances. The rule has not been recently applied and recent cases on fraudulent conveyances look more to the facts to ascertain intent.

The Court then turns to the other rules on fraudulent conveyances under Kansas law. For the most part the law of fraudulent conveyances in Kansas is a series of rules designed to determine from the circumstances whether the necessary "fraudulent" intent is present.

■ At the outset it should be noted that the word "fraud" or "defraud" in this context, does not require some ulterior motive or chicanery. Rather, it is intended as a term of art to allow recovery of certain types of transfers.

In the more recently active branch of fraudulent conveyance law, the Kansas courts have developed a series of checklists to assist courts in divining the intent of the parties from the surrounding circumstances. Ultimately, of course, under Kansas law the question of intent is one of fact.

As noted by this Court in *In re Washburn, supra,* the most recent utterance by the Kansas Supreme Court on the fraudulent conveyance issue is *Credit Union of America v. Myers,* 234 Kan. 773, 676 P.2d 99 (1984). There the court listed six badges or indicia of fraud from which the court, in considering the conduct and appearance of the parties, can conclude that fraudulent intent was involved. The Kansas courts have, of course, noted that fraud may be proved other than by direct proof which can seldom be obtained. *Cox v. Cox,* 39 Kan. 121, 17 P. 847 (1888); *Credit Union of America v. Myers, supra.* The six badges, or indicia, are: "(1) a relationship between the grantor and grantee; (2) the grantee's knowledge of litigation against the grantor; (3) the insolvency of the grantor; (4) a belief on the grantee's part that the contract was grantor's last asset subject to a Kansas execution; (5) the inadequacy of the consideration; and (6) consummation of the transaction contrary to normal business procedures." *Credit Union of America v. Myers,* 234 Kan. at 778, 676 P.2d 99. Obviously many of those criterion do not directly apply in the situation where the transfer is not to a third party, but rather a transformation from one type of property to another. In this case the grantor and the grantee, the debtor, are the same person. Certainly the debtor had knowledge of the litigation pending against him as well as his insolvency and clearly understood that this was the last nonexempt asset having withdrawn it from an exempt pension plan.[9]

This Court, in *Washburn, supra,* found it persuasive to consider the similar list of factors considered by the Washington bankruptcy court in *The Matter of Mehrer,* 2 B.R. 309, 312 (Bankr.E.D.Wash.1980). Washington state has a similar statute exempting from the claims of creditors the "proceeds and avails of a life insurance

policy." R.C.W. 48.18.410(1). The peculiar phrase "proceeds and avails" has been held to include the cash surrender value. *In re Elliott,* 74 Wash.2d 600, 446 P.2d 347 (1968). The Washington courts, however, appear to have created an exception to the effect that if the premiums used to pay for the life insurance policy were paid with the intent to defraud creditors, then the creditors are allowed to recover such proceeds with interest. *See Levinson v. Green,* 296 F. 598 (9th Cir.1924), R.C.W. 48.18.410(3)(c). The court in *Mehrer* enumerated seven factors which it felt compelled the conclusion that the debtor in that case had intended to defraud creditors. Those factors. were: (1) whether there was fair consideration paid for the life insurance policy; (2) whether the bankrupt was solvent or insolvent as a result of the transfer or whether he was insolvent at the time of the transfer; (3) the amount of the policy; (4) whether the debtor intended in good faith to provide by moderate premiums some protection to those to whom he had a duty to support; (5) the length of time between the purchasing of a life insurance policy and the filing of the bankruptcy; (6) the amount of nonexempt property which the debtor had after purchasing the life insurance policy; and (7) the debtor's failure to produce available evidence and to testify with significant preciseness as to the pertinent details of his activities shortly before filing the bankruptcy petition.

Neither the list in the *Mehrer* case nor the set of factors in the *Credit Union of America v. Myers* case, of course, are exclusive. These are only factors to be considered by the court in determining the ultimate question of fact: the debtor's intent in transferring or transforming the assets. In this case the Court reaches the conclusion that the debtor obtained the policy for the purpose of defrauding one or more of his creditors.

---

9. Although the state court litigation appears to have resolved PSB's claim to the funds against the bank, that case remains on appeal and that cloud on debtor's unfettered claim to the pension plan funds has to have been a consideration of the debtor in withdrawing those funds in

1985. The Court does not reach any question as to whether PSB would have had any "peculiar equity" in the ERISA funds under the circumstances. That has not been brought before the Court.

■ Here the debtor paid into three insurance policies $175,000.00, virtually doubling his life insurance coverage at a time when he was admittedly insolvent. He remains the owner of those policies with substantial rights to withdraw the funds although he has expressed his intention not to do so. The transfer into the insurance policies (if indeed it is a transfer rather than a transformation), left the debtor without assets with which to satisfy the claims of his many creditors. Again, it should be noted that had he paid the money over to his offspring or used the money to satisfy part, but not all, of his creditors, these funds would be recoverable under bankruptcy law.[10]

Given the close proximity between the purchase of the assets and the bankruptcy filing, the debtor's awareness of not only his insolvent situation, but also the need to protect the assets and the substantial amounts of other life insurance existing at the time, the Court concludes that the necessary intent to defraud was present and that the objection to his exemption of the two U.S.F. & G. and the Southwestern Life Insurance Company policies should be sustained.

The debtor has stipulated that he was insolvent at the time the money was withdrawn from the pension plan in June of 1985 and continued to be so when the funds were paid over to the insurance companies in July. Within 51 days of the last payment, the debtor filed bankruptcy. At the time he was negotiating and purchasing the three policies in issue, the debtor had $743,000.00 in existing life insurance policies with existing cash values of in excess of $90,000.00.[11] Given the existing coverage, the Court cannot say that the debtor intended, in good faith, to provide by *moderate* premiums some protection to his wife, the beneficiary.

The debtor testified candidly that he had been fully advised as to the need to place the funds withdrawn from the plans in an exempt form. He was advised by two experts in their fields, his attorney and Mr. Laing and specifically discussed "defensive estate planning" with Mr. Laing. Having withdrawn the funds from the ERISA plans he then placed them in a form which he could reach, but he thought his creditors could not. The debtor stated that he had no intent to defraud his creditors. However, as the Tenth Circuit has noted, the debtor's protestations of an honest intent are not controlling when contradicted by the surrounding circumstances. *In re Liming*, 797 F.2d 895 (10th Cir.1986). It appears from the *Sempke, Swartz* and *Myers* cases, *supra*, that Kansas does not necessarily contemplate a dishonest or immoral motive in allowing creditors to recover a "fraudulent" transfer. Rather the court must merely conclude that the debtor intended to place the assets out of the reach of creditors.

Therefore although the transfer is not deemed fraudulent as a matter of law pursuant to *Swartz* and *Sempke, supra*, the circumstances are such that a fraudulent intent is indicated pursuant to *Myers, supra*. The Court finds that the objection to the exemption should be sustained and the exemption accordingly denied.

The foregoing memorandum constitutes findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.

---

10. The last payment on July 29, 1985 was within 51 days of the filing of the petition for relief, on September 18, 1985.

11. A substantial policy with Alliance Life Insurance Company which was converted from term to whole life in June of 1985 has subsequently lapsed. The policy had a face value of $283,000.00 at the time of the transactions herein.